1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

EASTERN DISTRICT OF CALIFORNIA

10
11

MARIO LEON,

No.  1:14-cv-00301-DAD-SKO  HC

12

             Petitioner,

**FINDINGS AND RECOMMENDATION TO DISMISS PETITION FOR WRIT OF HABEAS CORPUS**

13

   v.

14

M. ELIOT SPEARMAN, Warden,

15

             Respondent.

16
17

     Petitioner Mario Leon is a state prisoner proceeding *pro se* with a petition for writ of

18

habeas corpus pursuant to 28 U.S.C. § 2254.  He alleges eight grounds for habeas relief based on:

19

(1) the gang expert's reliance on inadmissible evidence (testimonial hearsay, *Miranda*[1] violation,

20

and inadmissible hearsay); (2) the gang expert's conclusory opinions; (3) insufficient evidence to

21

support gang allegations; (4) failure to bifurcate gang allegations and underlying substantive

22

charges; (5) insufficient evidence to support robbery and murder convictions; (6) the trial court's

23

erroneous response to a jury question; and (7) ineffective assistance of counsel (evidence of

24

Meza's gang membership).  Having reviewed the record as a whole and applicable law, the

25

undersigned recommends that the Court deny the petition for writ of habeas corpus.

26
27
28

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

# I.     Factual Background

## A.     The Underlying Crime

On July 21, 2007, co-workers Esteban (Steven) Coria, Hugo Aguilera Meza, and Carlos Lopez left work at VF Outdoor in Visalia sometime after midnight.  The three men talked in the VF Outdoor parking lot for a while before travelling together in Lopez's car, a black Nissan Sentra, to meet Coria's girlfriend in a park. They drank some beer.  At about 3:00 a.m., the men stopped at a Texaco station at Houston and Ben Maddox Streets in Visalia to get gas.

All three went inside the station, where Lopez paid for the gas and Coria bought cigarettes.  Records from the station's video surveillance system, which was later recovered by Visalia police, showed the three men entering and leaving but provided coverage only for the interior of the station's convenience store.  Although the arrival of the 1990 or 1991 Oldsmobile from which three more young men exited can be seen on video through the store's doorway, the images are too indistinct for identification.

As Coria, Meza, and Lopez pumped gas, the three more recent arrivals approached and demanded money.  One wore a white shirt, one wore a black shirt and red cap, and one wore a red shirt. When Coria, Meza, and Lopez refused to turn over any money, the man in the white shirt, later identified as Petitioner, pulled a handgun from his waistband, pointed it at Lopez, and threatened to shoot if Lopez did not give him everything in his pockets.  Lopez took a swing at the gunman and verbally challenged him to shoot.  The gunman shot Lopez in the chest.  After Lopez fell, the gunman repeatedly tried to stomp Lopez's head until one of his companions dragged the gunman back to the Oldsmobile, in which the attackers fled the scene.

Coria and Meza lifted Lopez into the back seat of his car and took off for Kaweah Delta Medical Center, calling 911 as they drove.  Clerks inside the convenience store also called 911 to report the shooting and Lopez's departure.  Alerted by the calls, Visalia Police Officer Joshua

2

Speers met Coria and Meza at the emergency room and assisted them in transferring Lopez inside, where he died from a single gunshot wound to the chest.

When Lopez was shot, witnesses Kay Breitmeyer and Brandon Myers, who were also on their way home from work, had just left a Jack in the Box drive-through and were waiting at the light to turn left from Houston onto Ben Maddox Street when they saw a flash of light from the gas station, which was about 80 feet away. Myers testified that he saw a small scuffle. A larger man fell, and a smaller man in a white shirt punched or kicked him several times while bystanders attempted to keep the victim's friends away. Aware that they were in an area of gang activity (and for Breitmeyer, aware that her mother would disapprove of her presence in that part of town), Breitmeyer and Myers agreed that they would not get involved. After Breitmeyer dropped Myers at his home and began driving towards her home, however, Breitmeyer thought she saw the get-away car stopped by police on the side of Mineral King Street. Rattled, she called her mother, who was then at work at Kaweah Delta Medical Center. Her mother, who was working in the emergency room where Lopez was then being treated, convinced Breitmeyer to come to the hospital to speak with the police officers there.

After speaking with Breitmeyer, Officer Speers drove her to Mineral King Street where she identified the car as the one that transported the victim but did not identify the man at the scene as having been involved in the shooting at the gas station. Officer Speers also took Coria to Mineral King, where Coria denied that the man was the gunman. Police released the couple in the car, Christina Garcia and Robert Romero, shortly thereafter. Garcia later testified at trial that although she and Romero, her then-boyfriend, had stopped at the Texaco station much earlier the prior evening, the car had run out of gas, and they had been stranded on the side of Mineral King since about 11:00 the night before, waiting for someone to help them.

///

3

Detective Steven Lampe interviewed Meza the night of the shooting; an audio tape and transcript of the interview were introduced at trial. Meza stated that, as he, Coria, and Lopez left the convenience store, they walked past a parked car with three men and three women. The men got out of the car and followed Meza and his friends back to Lopez's car. The man in the white shirt pointed a gun and told Lopez and Meza to empty their pockets. Lopez protested, "We don't even bang." When Lopez refused to give the man money, the man threatened to shoot Lopez in the leg. Lopez said, "Do it," and the man shot him once in the chest. Meza described the shooter as a Hispanic male, about 20 years old, about five feet, nine inches tall, with a shaved head and the tattoo of a star above his right eye.

At the same time, Officer William Diltz interviewed Coria, who stated that as they were pumping gas, several people approached them and demanded money. Lopez resisted the robbers, saying, "Go ahead and shoot, There is a cop right there. You'll get caught up in this." One of the men then shot Lopez. Coria described the shooter as a young Hispanic male, approximately five feet, ten inches, with tattoos on his inner forearms.

Despite searching police records, Visalia detectives were unable to find any record of a prior offender with a star tattoo on his forehead. On August 6, 2007, Officer Curtis Brown, who was also assigned to the Lopez murder, responded to a neighbor's complaint of a noisy party. When he arrived at the house of which the caller had complained, Petitioner answered the door. Familiar with the description of the wanted shooter, Brown saw that Petitioner fit the description, including the star tattoo on his forehead.

Following Petitioner's arrest, Diltz arranged to modify Petitioner's photograph artfully to remove the star tattoo. He then prepared a photo array including Petitioner's altered photograph and the photographs of seven similar looking individuals. On August 13, 2007, Diltz presented the array to Coria, who immediately identified Petitioner's photograph as the shooter, but added

4

that when Petitioner shot Lopez, he had a tattoo over his right eye.  On August 27, 2007, Coria

identified Petitioner's photograph in a different photographic line-up.

Diltz showed the lineup to Meza separately.  Meza also picked Petitioner's photograph as

the individual who shot Lopez and also noted that the shooter had a star tattoo that was not shown

in the photograph.  When Diltz showed Meza the unaltered photograph, Meza identified the tattoo

as the one on the shooter's forehead.

At trial both Coria and Meza disavowed their prior identifications of Petitioner and

claimed they could not remember details of the shooter's appearance.  Both denied having seen a

star tattoo.  Coria testified that he never saw a star tattoo but that Meza told him that the shooter

had such a tattoo.  Meza testified that he never saw a star tattoo but that Coria told him that the

shooter had one.

Diltz testified that he executed a search warrant on Petitioner's home and bedroom on

August 23, 2007.  The following items were recovered from Petitioner's bedroom: a red beanie

cap, a red-and-white striped baseball cap embroidered with a letter "N," a red San Francisco 49ers

cap, a red cloth belt with an "N" buckle, a green pencil drawing of a sombrero bearing the word

"Norte," a compact disc labelled "North Side Visa tracks," and a front page article from the

*Visalia Delta* (May 12-13, 2007, weekend edition), headlined, "Gangs Creep In."  Police also

recovered multiple photographs of Petitioner, with and without his star tattoo, wearing a white

shirt and red hat, and flashing gang signs with other individuals.

**B.      Gang Expert Testimony**

Visalia Police Officer Luma Fahoum testified as a gang expert. She stated that Norteños

are a predominantly Hispanic gang that identifies with the color red and the number "14."  ("N" is

the fourteenth letter of the alphabet.)  Common Norteño tattoos include the letter "N," the Huelga

bird, the north star, and various representations of the number 14, including four dots.  The

5

Norteño clique in Visalia is North Side Visa.  Visalia has about 1000 Norteños.  The Norteño gang's main rival is the Sureño gang, which identifies with the color blue, the letter "M" (for Mexican Mafia, the Sureños' predecessor prison gang), and the number 13.

North Side Visa's primary activities include vandalism, burglary, carjacking, assault with a deadly weapon, drive-by shootings, robberies, murder, and witness intimidation. The majority of gang violence arises from turf disputes.  Gang members commit crimes in groups to demonstrate their dominance in a particular geographic area or "turf."  The Texaco station at Houston and Ben Maddox Streets is located in Norteño gang territory.

According to Fahoum, committing a crime enhances an individual member's standing within the gang as a whole.  As a member's gang status increases, the types of crime that he commits progress from minor crimes, such as tagging (painting gang graffiti), to more violent crimes.  Gang crimes are not limited to attacks on the members of rival gangs.  Gang members also commit crimes of opportunity, such as robberies and carjackings, against any victim who happens to be in the wrong place at the wrong time.

Predicate offenses for North Side Visa included a 21-store robbery spree committed by North Side Visa gang members Robert Mendoza and Usibio Campos in July 2005, and Visa gang member David Huerta's September 21, 2007, shooting of a fellow gang member who was dating Huerta's former girlfriend and refused to apologize to Huerta for dating her.  Fahoum explained that Huerta likely perceived the refusal to apologize as an insult: "In the gang world, no insult goes unanswered.  You're not really worth your salt as a gangster if you're going to walk away. And he was insulted multiple times.  One, he was dating his girlfriend.  Two, he refused to apologize for it.  So it just went all sorts of bad for the victim."

Fahoum testified to the difficulty of finding witnesses to gang crimes who are willing to come forward to testify.  In the rare event that a witness makes an initial statement, he is likely

6

later to recant or refuse to come to court out of fear.  Gang members who give testimony, even about the activities of rival gang members, will be labeled a rat or a snitch.  They and their families face punishment and harassment, and they frequently elect to move somewhere else.

In response to the hypothetical question modeled on the facts of the underlying incident, Fahoum opined that the crime was for the benefit of the criminal street gang.  She explained that the gang member/robber interpreted the victim's refusal to hand over his money as an insult.  In the presence of other gang members (as evidenced by their red clothing), the gang member/robber had to respond to the victim's insult to avoid being labeled as a coward.

Officer Fahoum testified that law enforcement personnel validate individual as gang members using a uniform set of ten criteria.  Although an individual is usually validated by three criteria, two criteria are sufficient if the individual self-admits to gang membership.  Custodial admission is particularly reliable since jail placement away from known enemies is a matter of safety.

Petitioner's validation was based on nine of the ten factors: (1) self-admission, (2) custodial admission. (3) association with known gang members, (4) gang tattoos, (5) gang clothing, (6) gang correspondence, (7) identified in pictures with gang members, (8) involvement in gang-related crime, (9) named by a reliable source.[2]  Petitioner had repeatedly disclosed his North Side Visa membership to law enforcement personnel.  On September 20, 2002, Petitioner, who was in the company of two Norteño members, told a police officer that he was a Norteño gang member.  On March 1, 2003, Petitioner told his probation officer that he "kicks it" with the Norteños.  On August 3, 2003, Petitioner told his probation officer that he had been associating with Norteño gang members since he was thirteen years old.  When interviewed on the same day, Petitioner's parents expressed concern about his gang activities.  On December 2, 2003, Petitioner

---

[2] Fahoum stated that there was no known correspondence between Petitioner and another gang member.

again admitted his association with North Side Visa.  On February 29, 2004, Petitioner's mother

contacted probation to report that Petitioner was out of control,  heavily involved in the gang, and

had tagged her laundry room door with graffiti ("X4" (for 14) and "Visa").

On March 8, 2004, while detained at juvenile hall, Petitioner called another detainee a

"scrap," which is a derogatory term for a member of the rival Sureño gang.  On March 9, 2004,

Petitioner was involved in a gang fight with a documented Sureño gang member.[3]  Petitioner was

documented as a Norteño member when he ran away from boot camp on November 24, 2004.  On

March 26, 2005, Petitioner, who was wearing a red shirt, told a police officer that he had been a

Norteño all his life and hated Sureños.

In addition, Petitioner bore multiple gang tattoos, including the letter "N" on his forearm

and the North Star on his forehead.  Officer Fahoum knew of no other Norteño gang member with

a star tattooed on his forehead.

### C.    The Defense at Trial

Petitioner testified at trial.  He admitted that he had associated with Norteño gang

members and he had sometimes worn gang attire, but maintained that he was not a gang member

on July 21, 2007.  Claiming that he was home in bed at 3:00 a.m. on July 21, 2007, Petitioner

denied that he attempted to rob Lopez and then shot him.  Petitioner denied ownership of the

gang-related items seized in the search of his bedroom, which he shared with his brothers.  He

also denied that the items belonged to one or both of his brothers and claimed that he did not

know to whom those items belonged.  Petitioner denied that his brothers were gang members.

Petitioner (born July 29, 1988) testified that his tattoos did not represent gang membership

and that he had obtained them when he was a "kid" of 13 or 14 in the California Youth Authority.

Petitioner acknowledged, however, that he had been released from CYA only a month before

---

[3] Following the fight, Petitioner was required to register as a Norteño gang member.

1    Lopez's murder.  He testified that the star above his eye was not gang-related but represented his

2    loyalty to his former girlfriend Estrella.[4]

3         Petitioner's mother, Lydia Guillen, testified in support of Petitioner's alibi.  On cross-

4    examination, however, Ms. Guillen admitted that she did not know whether Petitioner woke up

5    and left the house after she went to bed at 11:30 p.m. the night before Lopez's murder.

6

7    **II.    Procedural Background**

8         On April 4, 2008, the Tulare County grand jury issued an indictment charging Petitioner

9    with one count of murder (Cal. Penal Code § 187(a)) and with the special circumstances of

10   (1) felony murder committed while the defendant was engaged in the commission of robbery

11   (Cal. Penal Code § 190.2(a)(17)) and (2) street gang murder (Cal. Penal Code § 190.2)a)(22)).

12   The indictment included special allegations of (1) personal and intentional use of a firearm (Cal.

13   Penal Code § 12022.53(d)) and (2) street terrorism (Cal. Penal Code § 186.22(b)(1)(c)).

14

15        Petitioner was tried before a jury in October 2009.  On October 9, 2009, the jury found

16   Petitioner guilty of first-degree murder and found all alleged special circumstances and

17   allegations to be true.  On January 19, 2010, Petitioner was sentenced to imprisonment for life

18   without the possibility of parole plus 25 years.

19        On January 28, 2010, Petitioner filed a direct appeal to the California Court of Appeal,

20   which affirmed the conviction and sentence in a written opinion dated October 14, 2011.  *People*

21   *v. Leon*, 2011 WL 4904412 (Cal.App. Oct. 14, 2011) (No. F059471).[5]  The California Supreme

22   Court denied the petition for review in February 2012.

23

24   ///

25   ///

26

27   ────────────────────────
     [4] The Spanish word for "star" is "estrella."
     [5] Because the California Supreme Court summarily denied review, the Court must "look through" the summary
28   denial to the last reasoned decision, which is, in this case, the opinion of the California Court of Appeal, Fifth
     Appellate District.  *Ylst v. Nunnemaker*, 501 U.S. 797, 803-06 (1991).

On March 4, 2014, Petitioner filed a petition *nunc pro tunc* for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Pursuant to the "mailbox rule," the petition was deemed filed on March 15, 2013.

### III.    Standard of Review

A person in custody as a result of the judgment of a state court may secure relief through a petition for habeas corpus if the custody violates the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000).  On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed thereafter.  *Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997).  Under the statutory terms, the petition in this case is governed by AEDPA's provisions because Petitioner filed it after April 24, 1996.

Habeas corpus is neither a substitute for a direct appeal nor a device for federal review of the merits of a guilty verdict rendered in state court.  *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring).  Habeas corpus relief is intended to address only "extreme malfunctions" in state criminal justice proceedings.  *Id.*  Under AEDPA, a petitioner can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams*, 529 U.S. at 413.

"By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)."  *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

As a threshold matter, a federal court must first determine what constitutes "clearly established Federal law, as determined by the Supreme Court of the United States." *Lockyer*, 538 U.S. at 71.  The Court must look to the holdings, as opposed to the dicta, of the Supreme Court's decisions at the time of the relevant state-court decision.  *Id.*  The court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law."  *Id.* at 72.  The state court need not have cited clearly established Supreme Court precedent; it is sufficient that neither the reasoning nor the result of the state court contradicts it.  *Early v. Packer*, 537 U.S. 3, 8 (2002).  The federal court must apply the presumption that state courts know and follow the law.  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).  The petitioner has the burden of establishing that the decision of the state court is contrary to, or involved an unreasonable application of, United States Supreme Court precedent.  *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

"A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Lockyer*, 538 U.S. at 75-76.  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Thus, the AEDPA standard is difficult to satisfy since even a strong case for relief does not demonstrate that the state court's determination was unreasonable.  *Richter*, 562 U.S. at 102.

**IV.     Ground One: Gang Expert Did Not Improperly Rely on Inadmissible Evidence**

As his first ground for habeas relief, Petitioner contends that his Fifth, Sixth, and Fourteenth Amendment rights were violated by the gang expert's reliance on inadmissible evidence.  The petition divides this claim into five parts: (1) violation of the Confrontation Clause

11

by Officer Fahoum's reliance on testimonial hearsay, contrary to *Crawford v. Washington*, 541

U.S. 36 (2004); (2) violation of Petitioner's right against self-incrimination by Officer Fahoum's

reliance on Petitioner's statements to law enforcement personnel; (3) Officer Fahoum's improper

reliance on inadmissible hearsay; (4) ineffective assistance of counsel who failed to object to

prejudicial testimony that had previously been ruled inadmissible;[6] and (5) cumulative prejudicial

error.

        **A.**       **Reliance on Testimonial Hearsay Violated Petitioner's Right of Confrontation**

      Petitioner contends that by offering an opinion reliant on testimonial hearsay, Officer

Fahoum violated Petitioner's Sixth Amendment right of confrontation.  The California Court of

Appeals rejected Petitioner's contention, concluding that *Crawford* does not bar a gang expert

from relying on hearsay as a basis for her opinions concerning a defendant's gang membership or

gang behavior generally.  *Leon*, 2011 WL 4904412 at * 7.

        **1.**       **Petitioner's Right to Confront Witnesses Against Him**

      The Sixth Amendment to the U.S. Constitution grants a criminal defendant the right "to be

confronted with the witnesses against him.  "The 'main and essential purpose of confrontation is

to secure for the opponent the opportunity of cross-examination.'"  *Fenenbock v. Director of

Corrections for California*, 692 F.3d 910, 919 (9th Cir. 2012) (quoting *Delaware v. Van Arsdall*,

475 U.S. 673, 678 (1986)).  "'Cross-examination is the principal means by which the believability

of the witness and the truth of his testimony are tested."  *Fenenbock*, 692 F.3d at 919 (quoting

*Davis v. Alaska*, 415 U.S. 308, 316 (1974)).  The Confrontation Clause applies to the states

through the Fourteenth Amendment.  *Pointer v. Texas*, 380 U.S. 400, 406 (1965).

      In *Crawford*, the Supreme Court held that the Confrontation Clause bars the prosecution's

introduction into evidence of a witness's out-of-court statements that are "testimonial" unless the

---

[6] Petitioner's allegations of ineffective assistance of counsel are addressed in Section X, below.

12

defendant had a prior opportunity to cross-examine the witness.  541 U.S. at 68-69.  Indices of reliability other than cross-examination do not apply to testimonial statements.  *Id.*  To determine whether a contested statement by an out-of-court declarant violates the Confrontation Clause, a court must first determine whether the contested statement constitutes testimonial hearsay.  *Id.*  If the court finds that the contested statement was testimonial, it must consider whether the declarant was unavailable and whether the defendant had a prior opportunity to cross-examine the declarant.  *Id.*

### 2.   Petitioner's Prior Statements to Authorities Were Not Testimonial Statements

Although the *Crawford* Court declined to provide a comprehensive definition of the term "testimonial,"  it stated that "[s]tatements taken by police officers in the course of interrogations are . . . testimonial even under a narrow standard."  *Id.* at 52.  The decision also formulated a "core class" of testimonial statements:  (1) "*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; (2) "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; and (3) "statements that were made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."  *Id.* at 51-52.

Petitioner contends that Petitioner's responses to questions posed to him by law enforcement and prison personnel from 2002-2007 regarding his gang membership, potential enemies, probation status, prior arrests, jail housing arrangements, information used to determine jail placement, and Petitioner's gang-related admissions constituted impermissible testimonial statements that violated the Confrontation Clause.  Doc. 1 at 22-23.  Because the evidence to which Petitioner objects consists solely of Petitioner's own statements to law enforcement and

13

prison personnel, *Crawford* does not apply. The Confrontation Clause applies to "witnesses against the accused," not to the accused himself. *See Crawford*, 541 U.S. at 823-24. Here, Petitioner himself was the source of the out-of-court testimonial statements.

Even if it were assumed that Petitioner could have a Confrontation Right against his own testimony, Petitioner was present in the court room, was available to testify, and actually did testify. "When a witness appears for cross-examination at trial, the Confrontation Clause places no restraint on the use of his prior testimonial statements." *Crawford*, 541 U.S. at 59, n. 9. *See also United States v. Allen*, 425 F.3d 1231,1235 (9th Cir. 2005) ("[A]lthough O'Neal's statement to Agent Taglioretti was "testimonial" under *Crawford*, . . . because O'Neal was available as a witness and cross-examined by Allen, the admission of O'Neal's out-of-court statement did not violate Allen's Sixth Amendment rights under *Crawford*.")

### 3. Summary and Recommendation

Because the statements to which Petitioner objects are not testimonial statements, Petitioner's Sixth Amendment right to confrontation was not violated. The Court should conclude that Officer's Fahoum's reliance on Petitioner's prior statements to law enforcement and prison officers is not a ground for habeas relief.

### B. Gang Expert's Use of Petitioner's Prior Statements Did Not Violate Petitioner's Right Against Self-Incrimination

Petitioner next contends that Officer Fahoum's reliance on Petitioner's prior statements to law enforcement and prison officers violated Petitioner's Fifth Amendment right against self-incrimination as articulated in *Miranda v. Arizona*, 384 U.S. 436 (1966).

Pursuant to *Miranda*, a person in custody must be informed before interrogation that he has a right to remain silent and to have a lawyer present. 384 U.S. 436. The decision formulated a warning to be given to all suspects before custodial interrogation. *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010). The qualify as interrogation, the circumstances must "reflect a measure of

14

compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980).  The custody requirement means that no statement that Petitioner made in a casual meeting with a police officer, as in a street interaction that resulted in the officer's making a field note, violated *Miranda*.  The only in-custody statements on which Fahoum relied were Petitioner's disclosure of enemies and gang affiliation upon entry into custody.

Routine booking questions to secure the "biographical data necessary to complete booking or pretrial services" are exempt from *Miranda*.  *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990).  In federal criminal prosecutions, a federal pretrial detainee's answer to a "routine booking question" about gang affiliation is admissible evidence even if obtained before a *Mirada* warning.  *United States v. Washington*, 462 F.3d 1124, 1132-33 (9th Cir. 2006).

The California Court of Appeal reasonably applied existing law to reject Petitioner's contentions of error.  It determined that Petitioner's disclosure of his Norteño membership fell within the exception to *Miranda*:

> In the 20-plus years since the [*People v.*] *Morris* [, 192 Cal.App.3d 380 (1987)] decision, gangs have become much more prevalent. Questioning about possible gang affiliations for housing purposes is now a routine question that is asked at booking,  "The routine booking interview is an indispensable procedure in the efficient administration of justice."  (*People v. Quiroga* (1993) 16 Cal.App.4th 961, 971.)  Questioning about gang affiliations is a security question that must be asked to facilitate safe housing in jails.  The officer conducting the booking inquiry should not have to think ahead to when a question might, in the future, become a link to a crime a defendant might commit.  As a result, the existence or nonexistence of *Miranda* advisements on a date not directly linked to the crime for which [the] defendant has been arrested is immaterial to the current offense.
>
> The only booking information relied on by Fahoum came from appellant's admission to boot camp on November 24, 2004, when appellant identified himself as a member of the North Side Visa clique of the Norteño gang.  There is nothing in the record suggesting that this instance involved gang behavior or gang

crimes.[7]  Thus, *Miranda* advisements were not required for the gathering of this routine booking information and Fahoum could properly rely on this information, consisting of appellant's own statement of gang membership, in reaching her expert opinion.

*Leon*, 2011 WL 4904412 at *9.

If a defendant's statement is admitted at trial in violation of *Miranda*, the claim is reviewed under a harmless error standard.  Habeas relief is only available if the error had a "substantial and injurious effect or influence in determining the jury's verdict," and resulted in "actual prejudice."  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  In this case, even if the state court had erred in permitting Fahoum to rely on Petitioner's disclosure of his gang affiliation when he was booked into boot camp, the error would have been harmless. As detailed in the factual background set forth above, evidence of Petitioner's gang affiliation included the photographs and clothing recovered in the search of Petitioner's bedroom, his gang tattoos, affiliation with known gang members, multiple instances of self-admission throughout his adolescence, and his tagging his mother's home with gang graffiti.  Although he denied gang membership on the date of Lopez's murder, Petitioner himself testified to association with Norteño gang members and wearing gang clothing.  Although he attributed his tattoos to immature decisions made while detained in the California Youth Authority, Petitioner admitted on cross-examination that he had been released from the Youth Authority only a month before the murder.  In light of the overwhelming evidence of petitioner's gang membership, the state court reasonably determined that Fahoum's reliance on Petitioner's booking disclosure of Norteño membership did not have a substantial injurious effect on the verdict or result in actual prejudice.

## C.     Gang Expert's Opinion Was Based on Inadmissible Hearsay

Petitioner next contends that, by admitting "double hearsay" in the form of Petitioner's self-admissions of gang membership to law enforcement officers and in response to booking inquiries, the trial court erred under California the California Evidence Code and related case law in failing to exclude evidence on which Fahoum relied for which the likelihood of prejudice

---

[7] "The probation officer's report indicates that appellant was committed to boot camp in November 2004 based on his commission of the misdemeanor offense of escaping from a juvenile hall or facility.  (Welf. & Inst. Code § 871.)"

16

1   outweighed the probative value.  Applying California law,[8] the California Court of Appeal

2   rejected this argument, concluding that the trial court did not improperly admit hearsay testimony

3   through the gang expert's testimony.  *Leon*, 2011 WL 4904412 at **5-6.

4         Issues regarding the admission of evidence are matters of state law, generally outside the

5   purview of a federal habeas court.  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009).

6   "The admission of evidence does not provide a basis for habeas relief unless it rendered the trial

7   fundamentally unfair in violation of due process."  *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir.

8   1995).  "[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned

9   review of the wisdom of state evidentiary rules."  *Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6

10  (1983).  "Although the [U.S. Supreme] Court has been clear that a writ should be issued when

11  constitutional errors have rendered the trial fundamentally unfair, see *Williams*, 529 U.S. at

12  375 . . ., it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial

13  evidence constitutes a due process violation sufficient to warrant issuance of the writ."  *Holley*,

14  568 F.3d at 1101.  Since the state appellate court's disposition of Petitioner's appeal was not

15  contrary to or an unreasonable application of Supreme Court precedent, a federal district court

16  may not grant the writ based on an alleged violation of state evidence law.  As a result, the Court

17  should not reach this claim.

18         **D.    Cumulative Error**

19         Because none of the above claims constitutes error, the Court need not reach Petitioner's

20  claim of cumulative error in Officer Fahoum's testimony.

21  **V.    Ground Two: Gang Expert Opined on Ultimate Issues**

22         As the second ground for habeas relief, Petitioner contends that by offering her

23  conclusions on Petitioner's Norteño gang membership and the murder's commission in

24  furtherance of  the Norteño gang, Officer Fahoum improperly offered her opinion on the ultimate

25  issues relating to the gang charges against Petitioner and based her opinion on insufficient

26  _____

27  [8] In *People v. Sanchez*, 63 Cal. 4th 665 (2016), the California Supreme Court disapproved the holding in *People v. Gardeley*, 14 Cal. 4th 605 (1996), among other California cases.  In rendering its opinion in Petitioner's case, the state court relied on *Gardeley*.  The Court offers no opinion on the likely outcome of any state action Petitioner might

28  pursue in light of *Sanchez*.

1   evidence of Petitioner's being a gang member.  In the alternative, Petitioner claims ineffective

2   assistance of trial counsel for failure to object to Fahoum's improper opinions on ultimate issues.[9]

3       **A.     Scope of Expert Testimony**

4           **1.     State Court Opinion**

5       The California Court of Appeal rejected Petitioner's claim, holding that Fahoum did not

6   exceed the bounds of permissible expert testimony:

> "'There is no hard and fast rule that the expert cannot be asked a
> question that coincides with the ultimate issue in the case.'
> [Citations.]"  (*People v. Valdez* (1997) 58 Cal. App. 4th 494, 507
> (*Valdez*).)  Admission of expert testimony whether the defendant is
> an active gang member or associate and whether a crime would
> benefit a gang routinely are upheld as falling within the scope of
> proper questioning.  (*Gardeley*, *supra*, 14 Cal. 4th at pp. 619-620;
> *People v. Ward* (2005) 36 Cal. 4th 186, 210 (*Ward*); *Valdez*, *supra*,
> 58 Cal.App.4[th] at 507-509; *People v. Zepeda* (2001) 87 Cal. App.
> 4th 1183, 1207-1209; [*People v.] Olguin* [(1994) 31 Cal. App. 4[th]
> 1355,] 1370-1371.)  However, a gang expert may not testify
> whether an individual possessed a specific intent or knowledge.  (*In
> re Frank S.* (2006) 141 Cal. App. 4th 1192, 1197 (*Frank S.*);
> [*People v.*] *Killebrew* [(2002) 103 Cal. App. 4th 644,] 658.)
>
> Contrary to appellant[']s assertions, Fahoum did not violate any of
> these principles when she testified that she had "no doubt"
> appellant was an "active participant in a criminal street gang" at the
> time of the crime and "no doubt" the conduct described by the
> prosecutor['s] hypothetical was "for the benefit of a criminal street
> gang."  In support of her opinions, Fahoum referred specifically to
> her previous testimony in which she explained that appellant met
> nearly all the criteria used by her department to validate someone as
> a gang member, and that gang members "commit crimes of
> opportunity of which robbery would be one of them" and "don['t]
> take kindly to insults."  Fahoum's testimony explaining why a gang
> member would feel honor-bound to shoot an attempted robbery
> victim who insulted the gang member by refusing to give him
> money and challenging the gang member to shoot him instead
> concerned matters "sufficiently beyond common experience that the
> opinion of the expert would assist the trier of fact" (Evid. Code §
> 801, subd. (a)) and "was not tantamount to expressing an opinion as
> to defendant['s] guilt."  (*Ward*, supra, 36 Cal. 4th at p. 210.)  As
> explained in *Olguin, supra*, 31 Cal. App. 4th 1355, "It is difficult to
> imagine a clearer need for expert explication that that presented by
> a subculture in which this type of mindless retaliation promotes
> 'respect.'"  (*Id.* at p. 1384.)
>
> *Leon*, 2011 WL 4904412 at *10.

---

[9] Petitioner's allegations of ineffective assistance of counsel are addressed in Section X, below.

1

2.      **No Federal Constitutional Claim**

2

Whether an expert witness's opinion improperly intruded upon the province of the jury is

3

not a federal constitutional question.  "[E]vidence erroneously admitted warrants habeas relief

4

only when it results in the denial of a fundamentally fair trial in violation of due process."

5

*Briceno v. Scribner*, 555 F.3d 1069, 1077 ( 9th Cir. 2009).   The U.S. Supreme Court has never

6

"made a clear ruling that the admission of expert testimony on an ultimate issue to be resolved by

7

the trier of fact violates the Due Process Clause."  *Duvardo v. Giurbino*, 410 Fed.Appx. 69, 70

8

(N.D.Cal. 2011).

9

"That the Supreme Court has not announced such a holding is not surprising, since it is

10

'well-established . . . that expert testimony concerning an ultimate issue is not per se improper.'"

11

*Moses v. Payne*, 555 F.3d 742, 761 (9th Cir. 2008) (quoting *Hangarter v. Provident Life &*

12

*Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004)).  "Although "[a] witness is not permitted to

13

give a direct opinion about the defendant's guilt or innocence . . . an expert may otherwise testify

14

regarding even an ultimate issue to be resolved by the trier of fact.'"  *Moses*, 555 F.3d at 761

15

(quoting *United States v. Lockett*, 919 F.2d 585, 590 (9th Cir. 1990)).  The Court should not reach

16

this claim.

17

**VI.     Ground Three: Sufficiency of the Evidence (Gang Charges)**

18

In ground three, Petitioner alleges that "[n]otwithstanding Petitioner's alleged gang

19

involvement, the state still failed to allege sufficient evidence to support the gang allegations."

20

Doc. 1 at 44.

21

**A.      State Court Opinion**

22

"To prove the gang enhancement allegation, the prosecution was required to show the

23

murder of Carlos Lopez was 'committed for the benefit of, at the direction of, or in association

24

with any criminal street gang, with the specific intent to promote, further, or assist in any criminal

25

conduct by gang members.' ([Cal. Penal Code] § 186.22, subd. (b).)"  *Leon*, 2011 WL 4904412

26

at *11.  The Court of Appeal found that substantial evidence supported both prongs of the

27

statutory test:

28

*///*

The incident took place in NSV gang territory. Despite the apparent lack of gang attire, appellant's gang affiliation was nonetheless on display through his tattoos, particularly the star tattoo conspicuously above his right eye. Appellant was accompanied by two males wearing red articles of clothing, a color associated with the gang. Although appellant's companions were never identified, the circumstances of the crime provided strong, if not conclusive evidence that they were either affiliated with or members of the NSV gang. Fahoum testified that gang members act together to commit crimes of opportunity, such as robbery. Moreover, there was evidence that the circumstances of the shooting were rooted in the gang culture of respect, power, and reputation. In our opinion, a reasonable jury could infer from the circumstances of the crime and the customs and priorities of the gang that appellant intended his shooting of a disrespectful victim of an attempted robbery to have the effect of elevating and expanding his reputation as an aggressive and violent member, thus facilitating future crimes committed by appellant and his fellow gang members.

*Id.* at *12.

## B.  **Standard of Review**

To determine whether the evidence supporting a conviction is so insufficient that it violates the constitutional guarantee of due process of law, a court evaluating a habeas petition must carefully review the record to determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Windham v. Merkle*, 163 F.3d 1092, 1101 (9th Cir. 1998). It must consider the evidence in the light most favorable to the prosecution, assuming that the trier of fact weighed the evidence, resolved conflicting evidence, and drew reasonable inferences from the facts in the manner that most supports the verdict. *Jackson*, 443 U.S. at 319; *Jones v. Wood*, 114 F.3d 1002, 1008 (9th Cir. 1997). The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the trier of fact could reasonably have reached its verdict. *United States v. Mares*, 940 F.2d 455, 458 (9th Cir. 1991).

## C.  **Substantial Evidence Supported Verdict**

That Petitioner would interpret the evidence differently is not controlling. The state court reasonably imposed the gang enhancement based on the substantial evidence of Petitioner's gang association or membership and the gang-related nature of the crime, as set forth in the factual

///

20

1    background above and articulated by the state court.  The Court should decline to grant habeas

2    relief based on insufficient evidence.

3    **VII.    Ground Four: Bifurcation of Substantive and Gang Charges**

4              As his fourth ground for habeas relief, Petitioner contends that the trial court erred in

5    failing to bifurcate the gang allegations from the underlying charges.  Because there is no federal

6    constitutional right to a bifurcated trial, the Court should not reach this claim.  *See Spencer v.*

7    *Texas*, 385 U.S. 554, 568 (1967) ("Two-part jury trials . . . have never been compelled by this

8    Court as a matter of constitutional law, or even as a matter of federal procedure").  The decision

9    whether or not to bifurcate Petitioner's trial was a matter of California state law, and Petitioner is

10   not entitled to federal habeas relief on errors of state law.  *See Swarthout v. Cooke*, 562 U.S. 216,

11   219 (2011);  *Estelle v. McGuire*, 502 U.S. 62, 64 (1991).

12   **VIII.   Ground Five: Sufficiency of Evidence--Murder Charges**

13             In ground five, Petitioner contends that, because the trial court did not instruct the jury on

14   attempted robbery and the evidence did not support a finding of a completed robbery, insufficient

15   evidence supported imposition of the robbery special circumstance and felony murder.

16        **A.        State Court Determination**

17             The Court of Appeal approached this issue as a jury instruction error rather than as the

18   sufficiency of the evidence issue posited by Petitioner.  The prosecution had pursued two theories

19   of first degree murder: premeditated murder and felony murder premised on Lopez's having been

20   killed in the course of Petitioner's attempt to rob Lopez.  The trial court instructed the jury on

21   felony murder and robbery but failed to instruct the jury on the elements of attempt.  Although the

22   state court agreed that omitting the instruction was error, the court found that the error was

23   harmless.

24             Under California law, when a defendant had been charged with an attempted crime, the

25   court typically instructs the jury using both the elements of the incomplete crime and CALCRIM

26   No. 6.00.  An attempt to commit a crime includes two elements, (1) specific intent to commit the

27   crime and (2) a direct, but ineffectual act done toward its commission.  Cal. Criminal Code

28   § 21a.  Failure to instruct the jury on both elements of attempt is error and requires reversal unless

21

1    no jury could find the missing element unproven.  A California court analyzes this question by

2    determining whether the jury verdict rested on proof establishing the elements of the crime

3    despite the omitted instruction, rendering the erroneous instruction harmless error.

4         The state court concluded that the instruction error in Petitioner's case was not prejudicial.

5    The first element of attempt, specific intent to commit the crime, was explicitly covered in the

6    instructions on felony murder, robbery special circumstance, and robbery.  As to the second

7    element, no reasonable interpretation of the evidence adduced at trial could have led the jury to

8    conclude that Petitioner had not actually begun committing the crime of robbery when Petitioner

9    pointed a gun at Lopez and demanded that Lopez relinquish his money and belongings.  As a

10   result, the outcome would not reasonably have been different even if the trial court had provided

11   CALCRIM No. 6.00.

12        **B.      Harmless Omission of Instruction**

13        Not every ambiguity, inconsistency, or deficiency in a jury instruction constitutes a due

14   process violation.  The test is "whether the ailing instruction . . . so infected the entire trial that the

15   resulting conviction violates due process."  *Estelle*, 502 U.S. at 72 (quoting *Cupp v. Naughten*,

16   414 U.S. 141, 147 (1973)).  On collateral review of state court criminal decisions, a federal court

17   must apply the standard of review applied to non-constitutional errors on direct appeal from

18   federal convictions.  *See Kotteakos v. United States*, 328 U.S. 750 (1946).  "Under that standard,

19   an error is harmless unless it 'had substantial and injurious effect or influence in determining the

20   jury's verdict.'"  *Fry v. Pliler*, 551 U.S. 112, 116 (2007) (quoting *Brecht*, 507 U.S. at 631).  The

21   omitted instruction must be evaluated in the context of the instructions as a whole.  *Boyde v.*

22   *California*, 494 U.S. 370, 378 (1990).

23        The California Court of Appeal's having explicitly found the error of omitting CALCRIM

24   No. 6.00 was harmless means that the omission did not have a substantial or injurious effect on

25   the jury's verdict.  Its reasoning was sound.  Having instructed the jury on felony murder, the

26   robbery special circumstance, and robbery, the trial court had explicitly provided the first element

27   of the attempt instruction, which required the jury to first find that Petitioner had the specific

28   intent to rob Lopez.  In fact, CALCRIM No. 6.00 explicitly directs the jury to refer to the separate

1   instructions on the underlying crime(s) to determine whether the defendant intended to commit

2   that crime.

3          The second element required the jury to find that Petitioner took a direct, but ineffectual,

4   step toward committing robbery.  The evidence adduced at trial indicated that Petitioner

5   approached Lopez and his companions, pointed a gun at Lopez, and demanded money.  When

6   Lopez refused to surrender his money and challenged Petitioner to act on his threat to shoot

7   Lopez, Petitioner shot Lopez.

8          The Court should conclude that the trial court's omission of CALCRIM 6.00 (attempt)

9   was harmless.

10  **IX.    Ground Six: Trial Court's Response to Jury Question**

11         As his sixth ground for relief, Petitioner contends that the trial court violated his rights to

12  due process and a jury trial when it responded incorrectly to the jury's question concerning the

13  difference between the gang special circumstance and gang sentence enhancement allegations.

14         **A.    State Court Determination**

15         During deliberations, the jury submitted a question concerning the difference between the

16  gang enhancement and the gang special circumstance.  Following colloquy with counsel, the

17  jurors returned to the courtroom, and the trial court stated:

18         [T]he question that I have is: "Please describe the difference
           between Penal Code Section 186.22(b)(1)(c) and 190.2(a)(2).'
19         They're essentially the same thing.  But for 190.2, that's what you
           call—what's called special circumstances, which means—which
20         [a]ffects the sentence.  They both affect sentence, but the 190.2
           requires active participation in the criminal street gang.  The 186.22
21         requires active participation or mere association with a criminal
           street gang.   Both of them require that the purpose of the
22         association or active participation further the interest or at the
           direction of and in association with the criminal street gang.  But
23         one required the special circumstance, 190 requires active
           participation.  The other requires merely association. Okay? Does
24         that do it?  You may retire and resume.

25         *Leon*, 2011 WL 4904412 at *15.

26         The state court summarized Petitioner's contention: "[T]he court's response to the jury's

27  question violated his state and federal constitutional rights to due process rights [*sic*] because, by

28  telling the jury 'the only difference between the gang sentence enhancement and the gang special

1    circumstance was that the latter required 'active participation' in a criminal street gang[,]' the

2    court effectively eliminated the mens rea requirement from the gang special circumstance

3    allegation that appellant intended to kill."  *Id.*

4        The state court concluded that because of his trial counsel's acquiescence in the trial

5    court's response to the question, Petitioner had waived his right to object under *People v.*

6    *Rodrigues*, 8 Cal. 4th 1060 (1994).  The court added that even if Petitioner had not waived his

7    rights, establishing a due process error required him to show a reasonable likelihood that the jury

8    has applied the challenged instruction in a way the violates the Constitution.  *Leon*, 2011 WL

9    4904412 at *16 (quoting *Estelle*, 502 U.S. at 72 (internal quotations omitted)).  The jury must be

10   presumed also to have followed CALCRIM Nos. 736 and 220, which instructed the jury that the

11   prosecution must prove beyond a reasonable doubt that appellant intentionally killed Lopez.  *Id.*

12   It was not reasonably likely that the jury considered only the trial court's answer to their question

13   and disregarded the other instructions.  *Id.*

14       **B.    Any Error in the Trial Court's Response Was Harmless**

15       Claims of erroneous jury instructions are generally matters of state law and do not

16   constitute grounds for federal habeas relief.  *Gilmore v. Taylor*, 508 U.S. 333, 343 (1993).  When

17   a petitioner seeks federal habeas relief for a jury charge error, he or she must show that the

18   instruction so infected the entire trial that the resulting conviction violated due process.  *Estelle*,

19   502 U.S. at 71-72.

20       "[A] trial judge . . . enjoys 'wide discretion in the matter of charging the jury.'"  *Johnson*,

21   351 F.3d at 994 (quoting *Charlton v. Kelly*, 156 F. 433, 438 (9th Cir. 1907)).  This discretion

22   extends to any additional instructions provided in response to questions from the jury.  *Id.* (citing

23   *Allen v. United States*, 186 F.2d 439, 444 (9th Cir. 1951)).  "When a jury makes explicit its

24   difficulties, a trial judge should clear them away with concrete accuracy."  *Bollenbach v. United*

25   *States*, 326 U.S. 607, 612 (1946).  "'The Supreme Court has clearly stated that it is reversible

26   error for a trial judge to give an answer to a jury's question that is misleading, unresponsive, or

27   legally incorrect.'"  *United States v. Anekwu*, 695 F.3d 967, 986 (9th Cir. 2012) (quoting *United*

28   *States v. Frega*, 179 F.3d 793, 810 (9th Cir. 1999)).  "But 'the precise manner by which the court

1  fulfills this obligation is a matter committed to its discretion.'" *Anekwu*, 695 F.3d at 986 (quoting

2  *Arizona v. Johnson*, 351 F.3d 988, 994 (9th Cir. 2003)).

3      To obtain habeas relief for an allegedly erroneous response to a jury question, a petitioner

4  must establish that (1) the response was an incorrect or inaccurate application of state law, (2)

5  constitutional error resulted and (3) the error was not harmless. *Morris v. Woodford*, 273 F.3d

6  826, 833 (9th Cir. 2001).  To determine whether constitutional error occurred, the court must

7  determine "whether there is a reasonable likelihood that the jury has applied the challenged

8  instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde*,

9  494 U.S. at 380.  If the court finds constitutional error, it must then determine whether the error

10  had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507

11  U.S. at 637.  A single instruction is not evaluated in isolation but must be considered in the

12  context of the charge as a whole.  *Morris*, 273 F.3d at 834.

13      Questions posed by a jury in the course of its deliberations often indicate that

14  deliberations are "troubled enough to seek advice." *Frantz v. Hazey,* 533 F.3d 724, 742 (9th Cir.

15  2008).  Thus, a trial court must word its response carefully to avoid influencing the jury's

16  decision.  *Id.*  For this reason, "defendants or their attorneys have a due process right to be present

17  in conferences when jurors' notes are discussed, *United States v. Barragan-Devis*, 133 F.3d 1287,

18  1289 (9th Cir. 1998), or 'when a trial court prepares a supplemental instruction to be read to a

19  deliberating jury,' *United States v. Rosales-Rodriguez*, 289 F.3d 1106, 1110 (9th Cir. 2002)."

20  *Frantz*, 533 F.3d at 743.  Counsel's presence provides a "critical opportunity" to object to the

21  proposed response or to suggest supplemental or alternative language.  *Id.*  Unlike the defendant

22  in *Frantz*, Petitioner's attorney participated in the discussion of the jury's question and did not

23  object to the trial court's response.

24      "'The ultimate question is whether the charge taken as a whole was such as to confuse or

25  leave an erroneous impression in the minds of the jurors.'" *United States v. Hughes*, 273

26  Fed.Appx. 587, 592 (9th Cir. 2007) (quoting *United States v. Walker*, 575 F.2d 209, 213 (9th Cir.

27  1978)).  A petitioner is not entitled to habeas relief unless the error "had a substantial and

28  injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.  Other

than the fact of his conviction, Petitioner here provides no basis from which the Court could infer that the trial court's response to the jury question had a substantial or injurious effect on the verdict.

The state court's denial of Petitioner's supplemental instruction claim is neither contrary to, nor an unreasonable application of, clearly established federal law.  The Court should decline to grant federal habeas relief based on the trial court's response to the jury's question.

## X.      Grounds One, Two, and Seven: Ineffective Assistance of Counsel

In his first, second, and seventh grounds for habeas relief, Petitioner contends he was denied effective assistance of counsel.

### A.      Standard of Review

The purpose of the Sixth Amendment right to counsel is to ensure that the defendant receives a fair trial. *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  "[T]he right to counsel is the right to effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970).  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that his trial counsel's performance "fell below an objective standard of reasonableness" at the time of trial and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694.  The *Strickland* test requires Petitioner to establish two elements: (1) his attorney's representation was deficient and (2) prejudice.  Both elements are mixed questions of law and fact. *Id.* at 698.

These elements need not be considered in order. *Id.* at 697.  "The object of an ineffectiveness claim is not to grade counsel's performance." *Id.*  If a court can resolve an ineffectiveness claim by finding a lack of prejudice, it need not consider whether counsel's performance was deficient. *Id.*

The scope of federal habeas review of a claim of ineffective assistance of counsel is narrow. *Dows v. Wood*, 211 F.3d 480, 484 (9th Cir. 2000).  A habeas petitioner has the burden of

proving that the state court applied the *Strickland* standard in an objectively unreasonable manner. *Bell v. Cone*, 535 U.S. 685, 699 (2002).

The standard for reviewing counsel's performance is "highly deferential." *Strickland*, 466 U.S. at 689.  "[E]very effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*  The petitioner must overcome the presumption that the challenged behavior constituted "sound trial strategy." *Michel v. Louisiana*, 350 U.S. 91, 101 (1955).  "The object of an ineffectiveness claim is not to grade counsel's performance." *Strickland*, 466 U.S. at 697.

Second guessing the quality of counsel's assistance after conviction or other adverse outcome is not sufficient to establish ineffective assistance. *Richter*, 562 U.S. at 105.  The Constitution requires only that counsel made objectively reasonable choices. *Roe v. Flores-Ortega*, 528 U.S. 470, 479 (2000).

**B.**     **Failure to Object to Gang Expert's Reliance on Inadmissible Evidence**

In ground one, Petitioner contends that trial counsel's assistance was ineffective in that counsel did not object to Officer Fahoum's testimony in violation of Petitioner's *Miranda* and Confrontation Clause rights and concerning evidence barred by the order *in limine*.  If the Court agrees with the undersigned's recommendation in Section IV that Petitioner's claimed violations of his *Miranda* and Sixth Amendment right to confrontation cannot prevail, the Court need not reach those allegations since trial counsel's failure to object would not be prejudicial.

The Court need consider only Petitioner's claim that trial counsel provided ineffective assistance when he failed to object to Officer Fahoum's testimony, in violation of the court's ruling *in limine,* that Petitioner's mother had reported to Petitioner's probation officer that Petitioner "was heavily involved in gangs" and "out of control . . . running the streets."  The state court found that counsel's error was not prejudicial since it was relatively brief and cumulative to other gang evidence. *Leon*, 2011 WL 4904412 at *10.

Although counsel's failure to object was error, flawless performance is not the prevailing norm. *Richter*, 562 U.S. at 110.  Although a single error may support an ineffective assistance

1   claim if it was "sufficiently egregious and prejudicial," a single error almost never establishes

2   ineffective assistance when the attorney otherwise provides vigorous and capable representation.

3   *Id.* at 111 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).   Counsel may have made a

4   strategic decision not to emphasize the testimony by objecting or intended to minimize it through

5   cross-examination or Ms. Guillen's testimony.   "In many cases cross-examination will be

6   sufficient to expose defects in an expert's presentation."  *Richter*, 562 U.S. at 111.

7        In any event, whether or not counsel's failure to object constituted deficient performance,

8   the error must be sufficiently egregious to satisfy the prejudice prong.   Under *Strickland*,

9   prejudice requires a showing of a reasonable likelihood that the result would have been different

10  if counsel had not erred.   466 U.S. at 696.   A "reasonable likelihood" requires proof of a

11  substantial likelihood of a different outcome.   *Id.*   Even if counsel had successfully objected to the

12  barred testimony, the error was not prejudicial.   As the state court determined, other substantial

13  evidence established Petitioner's ties to the Norteño street gang: Officer Fahoum testified to

14  Petitioner's satisfying nine of the ten categories for validating a individual as a member of a

15  criminal street gang.   Far fewer categories were required to establish gang membership.   Trial

16  counsel's failure to object to Fahoum's testimony indicating reliance on Ms. Guillen's

17  incriminating statements was not substantially likely to have resulted in a different outcome.

18  Because the state court's decision was reasonable, the Court should not grant habeas relief based

19  on counsel's failure to object.

20        **C.        Failure to Object to Gang Expert's Offering Opinion on Ultimate Issues**

21        In ground two, Petitioner contends that trial counsel provided ineffective assistance by

22  failing to object to Fahoum's improper opinion on the ultimate issues of Petitioner's gang

23  membership and commission of the murder in furtherance of Norteño gang objectives.   Because

24  Fahoum's expert opinion was within the scope of permissible expert testimony (*see* Section V

25  above), trial counsel's failure to object cannot constitute deficient performance.

26  ///

27  ///

28  ///

**D.    Failure to Object to Admission of Evidence Impeaching Meza's Testimony**

In ground seven, Petitioner contends that trial counsel's assistance was ineffective because counsel failed to object to inadmissible hearsay evidence that Meza was a Sureño gang member.[10]

### 1.    State Court Determination

Evidence of Meza's Sureño gang membership was introduced to explain Meza's refusal to identify Petitioner at trial even though he had identified Petitioner in his statement shortly after the shooting.  Meza had been jailed on unrelated charges after his statement, and his identifying Petitioner at trial exposed Meza to likely retaliation by other prisoners.  The state court set forth both the basis for this claim and its decision:

> At appellant's trial, Meza, who confirmed he was currently in custody on an unrelated murder charge, testified that he did not remember what the person who shot Lopez looked like and that he could not identify anyone in the court[room] as the shooter.  Meza claimed not to remember a number of other details he had previously reported concerning the incident, explaining, "I got a bad memory, you know?"  Meza also denied being a gang member.

> The prosecution thereafter sought to introduce evidence that Meza was a gang member.  The court discussed the issues with the parties as follows:

> "THE COURT: . . . [B]ased upon the testimony of Mr. Meza during this trial where he was totally uncooperative, the Court does not believe he doesn't remember.  The Court believes he is obfuscating and refusing to answer the questions.

> "The testimony that he gave at the grand jury proceeding is [a] prior inconsistent statement based upon that obfuscation.  I'm going to allow it to be admitted to the jury as a prior inconsistent statement . . . .

> "[THE PROSECUTOR]: And then I believe the information regarding Mr. Meza's gang contacts also needed to be admitted.

> "THE COURT: There was testimony at the grand jury proceeding regarding gang indicia for Mr. Meza, and he denied any gang association or affiliation or membership, and apparently, there's evidence to the contrary.  And that was presented to the grand jury. I'm going to allow that to be admitted and presented to the jury also."

> Without any defense objection, the court allowed the prosecution to introduce exhibit No. 32 into evidence, which consisted of the

---

[10] Nothing in the record explicitly suggests that Lopez's shooting related to Meza's and Petitioner's membership in rival gangs.

following excerpt from a grand jury transcript, wherein the prosecutor read testimony from the gang expert given in a preliminary hearing on Meza's case:

"[THE PROSECUTOR]:  And what I'm reading to you is from a preliminary hearing on the current case that Meza is in custody for. And this was a gang expert on that case regarding any contacts Hugo Meza has with law enforcement.

"And it says starting in on May 12th of 2004, he was contacted by Officer McWilliams at El Diamonte High School, and Officer McWilliams was advised of the burglary and that he identified Hugo Meza as a Sureño gang member.  [¶] . . . And when he was booked in  . . . juvenile hall on 4-5-06 regarding that, actually, I'm not sure if that was that same El Diamonte incident or not, for 506, he was booked into juvenile hall at that time as a Sureño gang member.   And when the officer looked at that, Hugo Meza's questionnaire at the jail, he said he wrote—Meza wrote that he associated with Southerners and has known enemies in custody for north."

In closing argument of appellant's trial, the prosecutor argued:

"Now, Officer Fahoum also talked about people being labeled as rats, gang members being labeled rats if they do come and testify. It doesn't matter if they're testifying against their own gang members or against rival gang members.  They're considered a rat. And why?  Because they take care of their own business,  They take care of things on their own.  They don't take care of it like normal people with law enforcement and going through the court system. They take care of it on their own.  So no matter what, if a gang member is testifying, they're going to be labeled a rat.  And you heard what happens to rats.  Nothing good.  They can be killed. They'll be beat up.

"You have Hugo Meza who is in jail facing his own charges.  He has to survive in jail.  He doesn't want to be labeled a rat.

"We have entered Exhibit Number 32, which is some evidence that was brought out at the grand jury regarding Hugo Meza's gang involvement.  He didn't want to admit to you he's a gang member, but, yet, when he's booked into jail on August 7, 2007, for his crime, he was booked in as a southern gang member.  So, again, he's concerned for his safety.  He doesn't want to be labeled a rat."

Appellant now contends he was denied effective assistance of counsel as a result of his trial counsel's failure to object "to the admission of Hugo Meza's 'gang contacts' as prior inconsistent statements in that evidence admitted contained no admissible statements of Meza."  We reject appellant's claim because he has failed to make the requisite showing of prejudice.

Appellant argues that he was prejudiced because "If Meza's testimony had not been impeached [by the evidence of his gang contacts], then the only remaining testimony inculpating appellant

was that of Esteban Coria."   Appellant observes that Coria consistently testified at pretrial proceedings and at trial that he never saw a star on the shooter's forehead.   Appellant concludes that, "if Meza had not been impeached, it is reasonably possible that the jury would have believed Meza and, in turn, believed appellant's defense that he was not involved in the crime."

The problem with appellant's argument is that there was much stronger evidence casting doubt on Meza's claim at trial that he could not recall the shooter, namely his consistent description and identification of appellant to police both the morning of the shooting, and when he identified appellant in the photographic lineups a few weeks later, when he pointed out to police that the photograph of the shooter did not show the star tattoo he observed during the shooting.  When the unaltered photograph was then put on display, Meza confidently identified him as the person who shot Lopez.  In light of the strong impeachment evidence provided by police witnesses against Meza, we find unpersuasive appellant's prejudice argument.

*Leon*, 2011 WL 4904412 at **17-18.

### 2.     No Prejudice Established

Little discussion is required to conclude that the state court's determination was reasonable.  Even if defense counsel had objected to the evidence used to impeach Meza's trial testimony, the strong evidence of the police officers' testimony concerning Meza's earlier identification of Petitioner as the shooter remained in evidence.  The state court reasonably determined that Petitioner did not establish prejudice from trial counsel's failure to object.

### E.     Summary and Recommendation

Petitioner has failed to establish that the state court unreasonably rejected his claims of ineffective assistance of counsel.  The Court should not grant federal habeas relief based on ineffective assistance.

## XI.   Certificate of Appealability

A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, but may only appeal in certain circumstances. *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides:

///

///

(a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

(b)  There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the

United States, or to test the validity of such person's detention pending removal proceedings.

(c)    (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

(A)  the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

(B)  the final order in a proceeding under section 2255.

(2)  A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3)  The certificate of appealability under paragraph (1) shall indicate which specific issues or issues satisfy the showing required by paragraph (2).

If a court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Although the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 537 U.S. at 338.

Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief to be debatable or wrong, or conclude that the issues presented required further adjudication.  Accordingly, the Court declines to issue a certificate of appealability.

**XII.**   **Conclusion and Recommendation**

The undersigned recommends that the Court dismiss the Petition for writ of habeas corpus with prejudice and decline to issue a certificate of appealability.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C § 636(b)(1).  Within **thirty (30) days** after being served with these Findings and Recommendations, either party may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections, if any, shall be served and filed within **fourteen (14) days** after service of the objections.  The parties are advised that failure to file objections within the specified time may constitute waiver of the right to appeal the District Court's order.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 ((9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:   **February 14, 2017**                         /s/ *Sheila K. Oberto*
                                                         UNITED STATES MAGISTRATE JUDGE

33